[No. 32219. *En Banc.* January 29, 1953.]

*In the Matter of the Estate of* A. W. BRIDGE, *Deceased.*

MARY BRIDGE HOSPITAL, INC., *Appellant,* v. EDNA VAN VLACK *et al., Respondents,* HELEN PIEROTH, *as Executrix, Cross-appellant.*[1]

[1] Reported in 253 P. (2d) 394.

*Teats & Teats,* for appellant.

*Metzler & McCormick, Vedova, Horswill & Yeomans,* and *Max R. Nicolai,* for respondents and cross-appellant.

FINLEY, J.—This case presents a somewhat unusual factual situation.

In January, 1949, Dr. A. W. Bridge died in Tacoma, leaving an estate in excess of half a million dollars. The bulk of the estate, by the residuary clause of the will, was left to the Mary Bridge Hospital, a charitable corporation. By the preceding paragraphs, the testator left a number of small bequests, ranging in size from one thousand to five thousand dollars, to certain specified individuals. We are here particularly concerned with the second paragraph, the

first dispositive clause of the will. This portion of the will read, in part, as follows:

"SECOND: I hereby will and bequeath unto the following named persons the amounts set opposite their respective names, provided, however, that if any of said named persons are now employed by me or the Mary Bridge Hospital and are not so employed at the time of my decease, then such named former employes are hereby willed and bequeathed nothing."

Following this paragraph was a list of twenty names of various friends, relatives, and employees of the testator. Most of them were never at any time employed by Dr. Bridge. Consequently, the proviso clearly had no application to them, and no question is raised as to the efficacy of the indicated bequests. On this appeal, we are concerned with eight of the persons listed. Basically, our inquiry is (1) whether they were employed by Dr. Bridge at the time of the execution of his will; and (2) (a) at the time of his death, or (b) if not employed at the time of Dr. Bridge's death, whether such nonemployment is excusable. The legatees are listed, together with the bequest willed to each of them, as follows:

1. Edna Van Vlack.............. $1,000.00
2. John Pieroth ................. 5,000.00
3. Harold N. Rosengreen......... 2,000.00
4. W. C. Riddell................. 1,000.00
5. Laura Zanusse ............... 1,000.00
6. D. B. Cook................... 1,000.00
7. Ann Conner .................. 5,000.00

8. "The National Bank of Washington, in trust for the use and benefit of Clara Edgar, $5000.00, the earnings and principal of which sum, less the costs and expenses of administering said trust estate, to be paid to Clara Edgar at the rate of $50.00 per month until all said sum and its earnings have been paid to her. Should she die prior to receiving said full sum and its earnings, the balance unpaid at the time of her death shall be paid to the Mary Bridge Hospital."

The will was executed on April 27, 1945. Although Dr. Bridge had suffered a stroke about two years previously and was not in good physical condition at the time, he was never-

theless continuing to operate several substantial business enterprises, employing a total of about one hundred people. Chief of these was the Bridge Clinic. This was an institution with a central office in Tacoma and branches in Seattle and elsewhere, through which Dr. Bridge, with the assistance of a number of other doctors, engaged in the practice of industrial contract medicine. At the time of the execution of Dr. Bridge's will, the individuals named in the above-quoted portion thereof *were employed as follows*: John Pieroth and Harold N. Rosengreen were doctors associated with the Seattle branch of the clinic. W. C. Riddell was a doctor and D. B. Cook, a dentist; both were associated with the Tacoma clinic. Edna Van Vlack was office manager of the Tacoma clinic. She also acted as Dr. Bridge's personal secretary. Laura Zanusse was an X-ray technician, employed by the Tacoma clinic. Ann O'Connor was employed by this clinic as a special nurse for Dr. Bridge, after his stroke. Finally, Clara Edgar was employed by the Mary Bridge Hospital as a hospital nurse.

By May of 1946, the testator's condition had greatly deteriorated. He was diabetic, had advanced arteriosclerosis, and suffered greatly from the effects of his stroke. Dr. Pieroth, his personal physician, testified as follows:

"A. Well, he was practically helpless, an invalid. He had had a hemiplegia a few years before, one side was almost completely paralyzed. Q. Was he able to move about? A. Not without help."

Under these circumstances, Dr. Bridge was finally forced to retire and to liquidate his medical business. No services were rendered by him or by the clinic after May 31, 1946. Drs. Pieroth, Rosengreen, Riddell, and Cook had continued to be associated with him in the work until they were forced to terminate the association by reason of his retirement. The employment of Edna Van Vlack and Laura Zanusse also terminated at this time. Clara Edgar had a heart attack about a month previously, became a patient in the Mary Bridge Hospital, and subsequently received a pension from the testator until she became sixty-five and eligible for a

government old-age pension. Ann O'Connor continued as the personal nurse of the testator until 1948, when, under circumstances which will be detailed later, her association with him was interrupted. Consequently, none of the legatees involved in this appeal was actually "employed" in the usual sense of the term by the testator at the time of his death; and the contention of the Mary Bridge Hospital, appellant, is that, in consequence, by the express terms of the second paragraph of the will, they are not entitled to their legacies.

After the death of Dr. Bridge, his executor presented a petition to the superior court of Pierce county, asking that the second paragraph of the will be construed, and particularly that a finding be made as to which of the individuals listed therein were employed by Dr. Bridge or by the Mary Bridge Hospital, (a) on the date of the will, and (b) on the date of his death, "within the meaning and intent of said second paragraph of said will." Pursuant to the petition, the court set the matter for hearing and directed that the parties named in the second paragraph of the will be cited to appear in order that the court, after hearing testimony, might ". . . make a finding as to whether or not any of said persons will be entitled to the bequest mentioned in said paragraph of said will . . ." No other person aside from those named in the will was cited to appear, nor was any notice published or otherwise given to the residuary legatee or to any other person interested in the estate.

In presenting the issues to the court, the executor and the attorneys for the parties named in the will agreed that the court should determine the issue involving the status of employment of the several legatees and whether each legatee was entitled to the bequest left to him. At the conclusion of the hearing, the court took the case under advisement and entered an order, concluding as follows:

"It Is Hereby Ordered, Adjudged and Decreed that the following named devisees, to-wit . . . Edna Van Vlack, Doctor David B. Cook, Laura Zanusse, Doctor John Pieroth, Harold N. Rosengreen, W. C. Riddell, Clara Edgar and Ann

Connor [Ann O'Connor], are entitled to the bequests here-inabove set opposite their names, and the Executor is hereby authorized, ordered and directed to pay said bequests to the respondents hereinabove named, or to their respective counsel."

The residuary legatee was not made a party to the proceedings. In *In re Bridge's Estate,* 40 Wn. (2d) 133, 241 P. (2d) 439, we held this omission was fatal to any consideration of the merits of the appeal. The case was remanded for a new trial, the residuary legatee to be made a party thereto. Thereafter, the executor filed a final report and petition for distribution. The present appeal is from the final order of distribution wherein all of the legacies in issue, except the one to Dr. Pieroth, were allowed. The legacy to Dr. Pieroth was disallowed on the ground that he was not employed by Dr. Bridge at the time of the latter's death.

It is first necessary to discuss the contention of respondents that the proviso of the second paragraph of the will has no proper application to Drs. Pieroth, Rosengreen, and Cook, since in respondents' view they were never "employed" by the testator in the usual sense of that word. With respect to Drs. Pieroth and Rosengreen, this argument is based largely upon an agreement entitled "Articles of Partnership," setting forth the terms and conditions under which these doctors went to work for the Seattle branch of the Bridge Clinic in 1937. This agreement referred to Pieroth and Rosengreen, as well as to several other doctors associated with the clinic, as "partners"; and the agreement provided that they should share in the profits and losses of the clinic. In 1941 and 1942, a Federal court decided that, for tax purposes, the Seattle branch of the clinic was not a true partnership but an individual enterprise of Dr. Bridge; and that withholding and social security taxes should be paid on the theory that the doctors associated therewith were employees. Respondents contend, however, that this made no difference in the manner in which the clinic was operated, and that Dr. Bridge still considered Drs. Pieroth, Rosengreen, and their colleagues as his partners. Therefore, they

argue, he could not have thought of them as employees when he made out his will.

This argument is not without force, particularly as applied to Dr. Pieroth, who appears to have directed the Seattle branch of the clinic quite independently, and who purchased it when Dr. Bridge went out of business. Nevertheless, in 1943, Dr. Bridge and Dr. Pieroth executed a document entitled "Employment Agreement," which, after designating the party of the first part as "A. W. Bridge, M.D., doing business as the Bridge Clinic, hereinafter designated as 'The Clinic,'" continued as follows:

"WITNESSETH, The Clinic hereby employs Dr. Pieroth to perform such medical, surgical and business services for The Clinic as and where The Clinic may designate, principally at Seattle. Dr. Pieroth hereby agrees to furnish such services to the Clinic, giving his full time to The Clinic, and will not practice medicine except for The Clinic during the lifetime of the agreement."

The agreement then sets forth a monthly salary to be paid Dr. Pieroth and provides for a sharing of the profits; but, unlike the Articles of Partnership which preceded it, the agreement contains no reference to a sharing of losses. A similar agreement was drawn up by Dr. Bridge and Dr. Rosengreen.

Respondents argue that these agreements had no significance; that they were drawn up purely as a result of the Federal court decision respecting tax liability; and that they did not change the relationship of the individuals concerned. It seems to us, however, that the agreements had no other effect than to define the status of the parties. Had Dr. Bridge made a class gift to all of his employees, there is little doubt but what Dr. Pieroth and Dr. Rosengreen, by virtue of these agreements if for no other reason, would have been entitled to share in the bequest. We think that, everything considered, these doctors must be considered as having been employed by Dr. Bridge at the time of the execution of his will, and therefore are subject to the proviso with which we are here concerned.

██ It is further claimed that Dr. Cook was not an employee, but an independent contractor. This argument, however, is no more convincing. It appears that Dr. Cook practiced dentistry in the Tacoma clinic under a profit-sharing agreement with the testator, by the terms of which he received fifty-five per cent of the net proceeds and the clinic received the remainder. The testator paid all operating expenses, and payments by the patients were handled through his office. Many of the patients were entitled to dental care by virtue of medical service contracts made with the clinic. In this respect, Dr. Cook's relationship to the clinic appears to have been similar to that of Dr. Riddell, who concededly was an employee. The Bridge Clinic, with its various branches, seems to have required the services of a number of doctors to handle its large business, and, except for those doctors who were at one time treated as partners, there does not seem to be any substantial basis for considering any of them as other than employees or for assuming that Dr. Bridge regarded them as occupying a different status.

██ Respondents argue that Dr. Pieroth, Dr. Cook and Edna Van Vlack, even if "employees" of the testator at the time of the execution of his will, were still not affected by the proviso of the second paragraph of the will by reason of the fact that they were still employed by him at the time of his death. As far as Dr. Cook and Edna Van Vlack are concerned, this contention is clearly without merit. It is true that, even after his disassociation from the clinic, Dr. Cook continued to examine and to clean Dr. Bridge's teeth from time to time, and that Edna Van Vlack—even after she ceased to be his employee—wrote personal letters for him on numerous occasions just as she had done in the past. But neither of these individuals received payment for these services, and it cannot be said that they were employed by the testator in any sense whatever.

In the case of Dr. Pieroth, the situation is somewhat more complicated. Although he was never on the payroll of the clinic after May 31, 1946, he continued as Dr. Bridge's personal physician until the death of the latter, making fre-

quent trips from Seattle to Tacoma in this capacity. After the decease of Dr. Bridge, Dr. Pieroth rendered a claim against the estate for professional services, and this claim was compromised in the sum of $3,750. Nevertheless, we are not of the view that this converted him into an employee. In common understanding, a personal physician is not considered as the employee of his patients, for the reason that he is quite free from their authority and direction and may carry out his professional duties in any manner he sees fit. After the separation of Dr. Bridge from the Seattle clinic, he had no more control over the professional activities of Dr. Pieroth than any of the latter's other patients possessed.

Accepting, therefore, appellant's view that Edna Van Vlack and Drs. Pieroth, Rosengreen, and Cook, as well as Laura Zanusse and Dr. Riddell, were employed by the testator at the time of the execution of his will—but not at the time of his death—we must determine whether, even so, they may escape the effect of the proviso under consideration. (The situations of Clara Edgar and Ann O'Connor are somewhat special and will be considered separately in the latter part of this opinion.) Briefly, the principal contention of these respondents is that, when the testator closed his clinic on May 31, 1946, strict compliance by them with the pertinent proviso or condition precedent was rendered impossible of performance, but through no fault on their part. From this, they conclude that, having rendered substantial performance by remaining in the employ of the testator until they were no longer able to do so, they should now be entitled to their bequests in spite of the nonfulfillment of the condition precedent specified in the will.

In opposition to this, appellant contends, of course, that the language of the will must be interpreted *exactly* as it reads, and that, since it unequivocally provides that ex-employees are to be bequeathed nothing, the court is not at liberty to conclude that they should take. Appellant argues against any consideration of the facts and circumstances surrounding the execution of the will. Obviously, such consideration would be for the purpose of attempting to ascertain the

probable intent of the testator. In the same vein, appellant would further discourage the court from considering the circumstances under which the condition was breached. In support of this view we are referred to the well-established principle of law that, where a will is clear, definite, and free from ambiguity, its provisions cannot be limited, extended, or explained by resort to parol testimony.

As appellant asserts, the rule is that parol testimony cannot be admitted to show that the testator meant one thing when he said another. *Feeney v. Lufkin,* 159 Wash. 82, 292 Pac. 257; *German-American State Bank of Ritzville v. Goodman,* 83 Wash. 231, 145 Pac. 221; *Winner v. Carroll,* 169 Wash. 208, 13 P. (2d) 450.

The soundness of this rule cannot be questioned, but we believe it does not apply to the situation with which we are confronted in the case at bar. The question with which we are here concerned is whether the enforced closing of the testator's business, which rendered impossible a fulfillment of the condition precedent by the employees, *was such an event* as was intended by him to have the effect of cutting off their bequests.

It is no novel doctrine that impossibility of performance may modify legal consequences. For example, it is well settled that impossibility will sometimes excuse the performance of conditions in contracts. *Asplund v. Mattson,* 15 Wash. 328, 46 Pac. 341. So it is with the law of wills; for centuries, courts have recognized that impossibility may modify the legal effect of the breach of a condition in a will. See Simes, The Effect of Impossibility Upon Conditions in Wills, 34 Mich. L. Rev. 909. Thus, in some circumstances, a beneficiary may be entitled to his bequest even though by the terms of the will it is dependent upon the fulfillment of a condition which, because of unforeseen impossibility, cannot be fulfilled.

In order to determine whether a legatee is entitled to take in this situation, it is necessary for a court to take into consideration matters extrinsic of the will itself. See 4 Restatement of the Law of Property 2551, § 438, comment

(c), quoted in full *infra. Inability of the legatee to perform the condition is something which, in the normal situation, the testator did not contemplate.* In such a case, the court's endeavor must be to determine what the testator would have done had he thought of the impossibility. In order to make this determination, it is necessary for the court to consider the facts and circumstances surrounding the execution of the will with a view to ascertaining the general intent and purpose of the testator. *No attempt is made to prove by extrinsic evidence that the testator intended something other than what he said;* on the contrary, *the justification for considering such evidence is that a state of facts has arisen which the testator did not anticipate and for which he consequently failed to provide.*

 Impossibility, however, will not in every instance excuse the performance of a condition attached to a devise or bequest in a will. There are certain situations where it is clear that it will not do so. Each case must be examined in the light of its own particular facts in order to determine whether the concept of impossibility of performance should be given controlling effect. In the present case, it is conceded that the condition upon which the bequests in question were limited, namely, that former employees should still be employed by the testator at the time of his death, was a condition precedent which normally would have had to be complied with before the interests of the legatees could have come into existence. This being so, we shall consider now the state of the law with particular reference to the question of when impossibility will excuse the performance of a condition precedent attached to and qualifying a bequest in a will; subsequently, we shall attempt to relate the law on the indicated question to the facts of the case at bar.

It was unquestionably the rule at common law that, before a *devise of real property* made upon a condition precedent could take effect, the condition had to be performed or fulfilled; and this was so, even though performance or fulfillment was rendered impossible through no fault of the devisee. 2 Coke on Littleton 206.a; Theobald on Wills (7th

ed.) 568; *Burdis v. Burdis,* 96 Va. 81, 30 S. E. 462, 70 Am. St. Rep. 825.

In certain situations, the same doctrine prevailed with respect to legacies of personal property such as those involved in the case at bar. *Priestley v. Holgate,* 3 K. & J. 286, 69 Eng. Rept. 1116. As a general rule, however, it did not. Legacies were originally under the jurisdiction of the ecclesiastical courts, which had adopted the civil law, and under that system of jurisprudence a legacy given upon an impossible or illegal condition became absolute, though the condition fail. *Executors of McDonough v. Murdock,* 15 How. (U. S.) 367, 412. When equity took over administration of personal estates, it adopted this principle. Pound, Legacies on Impossible or Illegal Conditions Precedent, 3 Illinois L. Rev. 1; 1 Roper on Legacies 754. With certain qualifications, it became part of the law of England, concurrently with the entirely inconsistent rule respecting devises of real property. 2 Jarman on Wills (6th ed.) 15; 2 Williams on Executors (11th ed.) 1008.

Though there are admittedly numerous exceptions, it may be said that, on the whole, American courts and text writers have recognized the existence of the rule in this country. They have defined it variously and not always consistently; but it can safely be said that in most instances it has been recognized that the general principle derives from the English law. The most precise definitions of the rule as applied in England are to be found in the various editions of Jarman on Wills, to which many of the American cases refer. In the sixth American edition (Vol. 2) of this work, the following statement is made:

"But with respect to legacies out of personal estate, the civil law, which in this respect has been adopted by Courts of Equity differs in some respects from the common law in its treatment of conditions precedent; the rule of the civil law being that where a condition precedent is originally impossible or is made so by the act or default of the testator, or is illegal as involving malum prohibitum, the bequest is absolute, just as if the condition had been subsequent. But where the performance of the condition is the sole motive of the bequest, or its impossibility was unknown to the tes-

tator, or the condition which was possible in its creation has since become impossible by the act of God, or where it is illegal as involving malum in se, in these cases the civil agrees with the common law in holding both gift and condition void." (p. 15)

For American authorities recognizing this rule, in whole or in part, see: *Frost v. Blackwell,* 82 N. J. Eq. 184, 188, 88 Atl. 176; *Seeley v. Hincks,* 65 Conn. 1, 31 Atl. 533; *Matter of Haight,* 51 App. Div. 310, 316, 64 N. Y. S. 1029; *Nunnery v. Carter,* 58 N. C. (5 Jones' Equity) 370, 78 Am. Dec. 231. See, also, 3 Page on Wills 760, § 1284; Thompson on Wills 564, § 377; 30 Am. & Eng. Encyclopedia of Law, Wills (2d ed.) 801; 57 Am. Jur. Wills 1019, § 1505; 122 A. L. R. 105 (included in Annotation, "Conditions, Conditional Limitations or Contracts in Restraint of Marriage").

Unfortunately, this complex definition, burdened as it is with qualifications and exceptions, can only be understood in the light of the history of the rule in England. See 1 Roper on Legacies (2d American ed.) 753, *et seq.* Rigidly applied, it seems excessively mechanical. See, also, Atkinson on Wills 350, § 147. Courts in this country have tended to take from it those features which suited their needs and on occasion have ignored those which did not. The result has been an actual modification of the English rule in those American courts which have adopted it at all. The simplified definition of the Ohio circuit court is probably compatible with the reasoning of most of the American cases accepting the rule in any form.

"If personal property is bequeathed upon condition which, before the time of performance, becomes impossible to be performed, the property vests in the legatee upon the death of the testator, unless it appears that the performance of the condition was the controlling motive for the making of the bequest." *Morley v. Calhoun,* 7 Ohio C. C. (New Series) 285. See, also, *Sherman v. American Congregational Ass'n,* 98 Fed. 495; *Lefler v. Rowland,* 62 N. C. (Phillips' Equity) 143.

Justice Story, in a significant comment that has influenced judicial thinking in this country, once stated:

"There is a modification of the strictness of the common law as to conditions precedent in regard to personal legacies which is at once rational and convenient, and promotive of the real intention of the testator. It is, that where a literal compliance with the condition becomes impossible, from unavoidable circumstances and without any default of the party, it is sufficient that it is complied with as nearly as it practically can be, or (as it is technically called) cy pres. This modification is derived from the civil law and stands upon the presumption that the donor could not intend to require impossibilities, but only a substantial compliance with his directions as far as they should admit of being fairly carried into execution. It is upon this ground that Courts of Equity constantly hold, in cases of personal legacies, that a substantial compliance with the condition satisfies it, although not literally fulfilled. Thus if a legacy upon a condition precedent should require the consent of three persons to a marriage, and one or more of them should die, the consent of the survivor or survivors would be deemed a sufficient compliance with the condition." 1 Story's Equity Jurisprudence (14th ed.) 379, § 405.

See *Matter of Costalo's Will,* 167 Misc. 755, 4 N. Y. S. (2d) 665; and *Burns v. Clark,* 37 Barb. (N. Y. Supreme Ct.) 496, both of which cases followed this reasoning. Though the rule, either in its English or American form, is open to attack on the grounds that it is conceptually illogical (see Pound, Legacies on Impossible or Illegal Conditions Precedent, 3 Ill. L. Rev. 1), there can be little doubt but that it has survived because, as is suggested in the above quotation from Justice Story, it generally serves to carry out the probable intent of the testator. As is said in the annotation on this subject at 27 L. R. A. (N.S.) 684:

"There is obvious justice *in not holding the devisee or legatee responsible for the consequences of a breach of or failure to perform, a condition,* where such breach or failure *is not due to fault on his part, and where it is clear that such a contingency was not within the testator's contemplation.* And at bottom the question always is whether it was the testator's intention that an involuntary breach of condition should operate to defeat the gift." (Italics ours.)

Two examples will suffice to bear this out: In *In re Thompson's Estate,* 62 York Legal Record 53 (Orphan's

Court Erie County, Pa.), testatrix' will left five thousand dollars to her sister-in-law, provided that the latter and her husband were living together at the time of testatrix' decease. The husband predeceased the testatrix by six months, thereby rendering literal performance of this condition impossible. Yet the court applied the rule here under consideration, and held that, since the sister-in-law had actually lived with her husband until he died, and since further performance of the condition was rendered impossible as a result of matters beyond her control, she should be allowed to take under the will.

In *Burns v. Clark,* 37 Barb. 496, 501 (N. Y. Supreme Ct.), testator gave plaintiff a legacy of two hundred dollars (to be paid one year after his decease), provided that at that time she (plaintiff) should be worthy of the gift in the judgment of testator's wife. Before the year had passed, the testator's wife became insane and consequently was incapable of making any determination as to the worthiness of the legatee. The court, nevertheless, found that the plaintiff was entitled to the legacy, since she had conducted herself so as to be "entitled to be judged worthy of the testator's bounty." Said the court:

"It could hardly have been the intention of the testator that in such case, being in fact worthy, she should lose the bequest, without fault on her part, by the interposition of death or disease. The severe logic of the common law might perhaps demand such a result, but the milder principles of the civil law, followed by the ecclesiastical courts and adopted by equity so far as relates to personal bequests, I think, allow us to reach a result which is, in the language of Justice Story, 'at once rational, convenient and promotive of the real intention of the testator.' "

The American Law Institute has followed the reasoning of such cases as these in promulgating the following general rule in 4 Restatement of Property 2548. This rule, it will be seen, is in general accord with what appears to be the usual American doctrine, save in one important respect in which it marks an even more decided departure from the English rule: It is stated to apply (logically enough, in modern

times) to devises of real property as well as to bequests of personalty.

"Impossibility of performance of the terms of a condition precedent, special limitation, condition subsequent or executory limitation, otherwise valid under the rules stated in §§ 434-437 excuses from such performance if, and only if, this result is the judicially ascertained intent of the person imposing the restraint." 4 Restatement of Property 2548, § 438.

Comment c, under this heading, reads as follows (p. 2551):

"c. *Determination of intent.* Normally, conveyors do not have in mind the contingency that impossibility may prevent the performance of the terms of otherwise valid restraints. Where impossibility is offered as an excuse for non-performance, the construction process required under the stated rule is a judicial inquiry, not as to what the conveyor actually intended, but as to what his intent would have been had he known of or anticipated the impossibility at the time he imposed the restraint (see § 241, Comment c). In ascertaining this intent, certain evidentiary factors must be considered in addition to the general rules of construction set forth in Chapter 18 of this Restatement (§§ 241-248). It is the balancing of these factors (which often separately persuade to inconsistent conclusions) which determines the issue of intent."

█ Both the courts and Restatement lay considerable emphasis upon the importance of the motive which actuated the testator in making the bequest upon condition. As the Restatement phrases it, *the question to be asked is whether the testator's primary concern was the betterment of the individual or the performance of the condition.* In the present instance, *it seems quite clear that the testator's principal, if not sole, motive was the betterment or benefit of the individual legatees.* Edna Van Vlack, his personal secretary, had been employed by him for twenty-three years at the time the will was executed; Clara Edgar had been employed for twenty-two years, while Laura Zanusse had worked for him "for many years." As has been shown, Dr. Pieroth was his personal physician and apparently his closest associate among the doctors who worked with him at the clinic. Dr. Cook was his dentist; Ann O'Connor, his personal nurse.

Dr. Rosengreen was one of his "partners" in the Seattle branch of the clinic, and Dr. Riddell was a good friend. Both Edna Van Vlack and Dr. Cook visited him on numerous occasions after their employment ceased and at such times would perform gratuitous services for him—Miss Van Vlack writing his letters, and Dr. Cook caring for his teeth; while Dr. Pieroth continued as his doctor. All of these factors indicate the close relationship between the testator and the legatees and tend to show that the motive of the gifts, principally at least, was to benefit his old friends and associates.

Why then the proviso? It could scarcely have been that Dr. Bridge anticipated that the possible closing of the clinic might throw these people out of their jobs and desired, in that event, to take away their legacies. In the first place, there is no indication that he was aware at the time he executed the will that there was even a possibility that his medical business would be terminated before his death. Secondly, there would have been no reason to deprive some of his best friends and most faithful employees of their legacies upon the occasion of a purely chance event, having no relation whatever to the motives which had originally inspired the gifts. It could not have been that he offered the bequests as rewards for staying in his employ until his death, for there is no evidence that most of the beneficiaries *even knew that they were mentioned* in his will. Dr. Rosengreen stated specifically that he had no such knowledge; Miss Edgar testified that, though she had understood she was to "receive something," she did not learn of this until after she had ceased to be employed.

Actually, the motive for the proviso was probably quite simple, and the same motive which has actuated many other employers to put similar clauses in their wills. It will be recalled that the beneficiaries listed under the second paragraph of the will included a number of individuals not involved in this appeal. Some of these were doctors and other employees of the testator whose employment with him was terminated prior to the closing of the clinic in May, 1946. There is no testimony in the record concerning the nature

of the relationship of these people to the testator; from the fact of the bequest, it may be presumed the relationship was cordial. Nevertheless, it is likely that Dr. Bridge was conscious of the possibility that some of them—as well, perhaps, as some of the present respondents—might leave the clinic or the Mary Bridge Hospital before his death. *First,* if he were to dismiss them, it might well mean that the harmonious relation existing between him and them had come to an end; *second,* it is probable that he did not wish to assist any person who would choose voluntarily to leave his employment. In the event of either of these contingencies, it may be supposed that he did not desire the employees involved to benefit under his will. This appears the most logical and sensible explanation for the insertion of a clause in the will providing that employees, not still working for him at his death, should not be permitted to take.

We now come to the question of whether the legatees were in any way responsible for the termination of their employment. As to this, there is no problem. All of those with whom we are presently concerned left their employment solely because the clinic was closed or was shortly to be closed. The condition that they should remain in the employ of the testator until his death was complied with to the full extent of their power to do so.

But what effect is to be given the fact that the testator failed to change his will, even after all of these employees had been discharged? Appellant urges that he did not change it because he desired to have the proviso carried out according to its letter, with the effect of eliminating his former employees from his will. But this is scarcely credible in view of the continued close and cordial relations which he maintained with them. It seems more likely that this is an appropriate occasion for the application of the following comment of the Restatement:

"When such knowledge [knowledge that performance of the terms of the condition is impossible] is acquired after the execution of the instrument of conveyance but before its effective date, as in the case of knowledge acquired by a testator subsequent to the execution of the will and before

his death, failure to revoke the instrument normally tends to an inference that the gift was to take effect despite the inevitable failure of its terms." 4 Restatement of Property 2555.

But it would appear most probable that the testator never realized that his will might be interpreted in the manner in which appellant here seeks to interpret it, or that the closing of his clinic could have the effect of depriving his beneficiaries of their legacies. As we have seen, it is highly probable that the actual turn of events was not foreseen by him at the time he executed his will. From the time he closed his clinic, he was a very sick man. As his illness progressed, he was not even able to turn himself over and could only sign his name with a mark. All in all, the preponderance of the evidence suggests that he did not change the will because he remained of the belief that the legatees involved here would still be entitled to inherit under it.

■ Since the apparent motive of the testator was to benefit these employees rather than to compel their employment until the date of his death; and since the employees performed the condition upon which their legacies were limited to the best of their ability, further precise, literal compliance therewith being impossible; we are of the opinion that the law, as applied by the courts and as set forth in the Restatement, requires us to hold that literal compliance with the condition should be dispensed with, and that the gifts to the employees shall become absolute, except in the case of Ann O'Connor.

■ The bequest to Clara Edgar requires some slightly special comment. As we have noted, Miss Edgar, who had been in the testator's service for twenty-two years, finally quit her job at the age of sixty-four because of a heart attack. This appears to have been at the suggestion of the testator, who felt that her condition would not permit her to continue working. It had nothing to do with the closing of the clinic, which took place a month or more later. She was cared for in the testator's hospital. When released, she was placed on a pension by the testator until she became

sixty-five, at which time she became eligible for a government old-age pension. The solicitude which Dr. Bridge displayed for Miss Edgar, perhaps more than any other single factor, indicates that *he was unaware that his will might be interpreted as appellant now seeks to interpret it*; surely he would have changed it—at least with respect to Clara Edgar—had he known of the possibility that she might lose her legacy because she was not actually working for him at the time of his death.

What we have said with respect to impossibility resulting from the closing of the clinic might well be applied to impossibility resulting from inability to continue work because of illness. But we need not rely on that as an analogy, for the reasoning of a New York court in a similar case presents us with an adequate basis for upholding Clara Edgar's bequest, irrespective of our considerations of the impossibility of literal performance of the conditions of the will in her case. In the case of *In re Hoe's Estate,* 176 Misc. 803, 804, 29 N.Y.S. (2d) 183, the testatrix' will read in part as follows:

"I give and bequeath the following sums to the persons named herein, if they respectively be in my employ at the time of my death as follows: . . . Five thousand ($5,000) Dollars, to Margaret Imlay."

The will was executed in 1934. In 1935, the attorney for the testatrix wrote a letter to Margaret Imlay (who had served as a waitress in the testatrix' household for over twenty-eight years), advising her that her employer had reluctantly come to the conclusion that because of her health and age she was no longer able to perform her duties. The letter released Miss Imlay from all further services and gave her a monthly pension of sixty-five dollars. When the testatrix died, her executor contended that Miss Imlay was not entitled to her bequest on the grounds that she was not employed by the testatrix at that time. The court said of this contention:

"Where a legatee is identified as an object of testator's bounty, as here, a liberal construction of the terms of the will should be employed. (*Matter of Altman,* 115 Misc.

476; *Matter of Fleming*, N.Y.L.J. Oct. 17, 1930, p. 306.) Obviously the petitioner was an object of the bounty of the testatrix at the time of the execution of the will. The letter of the decedent's attorney, which was written shortly after the execution of the will and codicil, by its very terms cannot be interpreted as changing the status of the petitioner as an object of the bounty of the testatrix. Such a construction of the will would make it tantamount to a revocation of the legacy to the petitioner. The letter itself negatives such intention on the part of the testatrix. I accordingly hold that the testatrix never discharged the petitioner from her employ nor did she ever intend to do so. Disability on the part of the employee to continue to render services should not be interpreted as a discharge of the employee, particularly where compensation of the employee is continued. (*Matter of Thompson*, 126 Misc. 91.)"

It will be seen that the situation before the court in the *Hoe* case and the situation involving Clara Edgar here are, for all practical purposes, identical. The reasoning of the New York court is persuasive and appears to justify upholding Miss Edgar's bequest. Because of this and for the reasons heretofore expressed, we hold Miss Edgar entitled to take under the second paragraph of the will.

The situation of Ann O'Connor remains to be considered. She became the personal nurse for the testator in 1944. It is undisputed that she was efficient and capable and did her work well until 1948, when she developed bursitis in one of her arms. This made it difficult for her to lift Dr. Bridge or to turn him over, and, as this was an important part of her job, a question arose as to her further capacity for the position. P. D. Norton, an accountant who assisted Dr. Bridge in the management of his business after his stroke, testified as follows concerning a conversation which resulted in Miss O'Connor's ultimate departure:

"A. . . . she didn't have to work, she said, so I says, 'Well we want to treat you right.' So I made her a proposition that she take a few months off and rest up and if she was able to take an eight-hour shift, why we would consider it. I said she could leave her furniture right there in the building and she made the remark that she didn't want to be on probation, and I could get somebody else. That is about what happened. Q. Did she leave the services then?

A. Yes. In a few days she moved her things out, what we didn't buy—she wanted to sell some things and we bought that out . . . Q. Was she thereafter employed by Dr. Bridge? A. No, she was never employed after that."

Nothing in Miss O'Connor's testimony contradicts the above-quoted testimony of P. D. Norton. It is contended that she did not resign, but merely took a leave of absence. As clearly appears from the above, she was offered the opportunity to take a leave of absence. She did not accept it. We think she is not entitled to the bequest.

It is our best judgment that Edna Van Vlack, David B. Cook, Laura Zanusse, John Pieroth, Harold N. Rosengreen, W. C. Riddell, and Clara Edgar are entitled to the bequests set opposite their names in the second paragraph of the will. The case is remanded to the trial court for revision of the decree of distribution and order approving final account in accordance with the views expressed herein.

SCHWELLENBACH, MALLERY, HAMLEY, and WEAVER, JJ., concur.

DONWORTH and OLSON, JJ. (concurring in part and dissenting in part)—We concur in the result reached in the majority opinion with one exception:

Dr. Pieroth (now deceased) purchased the Seattle clinic from Dr. Bridge when he ceased to operate it May 31, 1946, thereby enabling Dr. Bridge to make it impossible for Dr. Pieroth to comply with the condition prescribed in paragraph second of the will, even if we should hold that he ever was in Dr. Bridge's employ. Dr. Pieroth's estate is, therefore, not entitled to any bequest under paragraph second.

We would affirm the judgment of the trial court except as to Ann O'Connor.

HILL, J. (dissenting)—I find myself in disagreement with the majority on the basic issue of whether the challenged legacies in paragraph "Second" of the will of Dr. A. W. Bridge can be sustained on the theory that excuse or waiver of the condition imposed on the legatees can be presumed by reason of impossibility of performance.

I quote again the language of the will with which we are presently concerned:

"SECOND: I hereby will and bequeath unto the following named persons the amounts set opposite their respective names, provided, however, that if any of said named persons are now employed by me or the Mary Bridge Hospital and are not so employed at the time of my decease, then such named former employes are hereby willed and bequeathed nothing: . . . ."

Following this language are nineteen bequests to individuals and one to the National Bank of Washington in trust for Clara Edgar. At least five of the persons named were not employees of Dr. Bridge or of the Mary Bridge Hospital when the will was executed, and no condition was attached to their bequests. A condition was attached to the bequests to the "named persons . . . now employed by me or the Mary Bridge Hospital," and the condition was that, if they "are not so employed at the time of my decease," such former employees "are hereby willed and bequeathed nothing." I can conceive of no clearer or more explicit language. There is no room for interpretation or for conjecture as to what the testator's intent might be. There is, at least to me, a certain sense of finality to the statement that those not meeting the conditions "are hereby willed and bequeathed nothing."

The executor challenged eight of the bequests as being to persons who were employees when the will was executed but were not employees when the testator died. Seven of these bequests were to "named persons" who were not employed by Dr. Bridge at the time he died. The eighth bequest challenged by the executor was to:

"The National Bank of Washington, in trust for the use and benefit of Clara Edgar, $5000.00, the earnings and principal of which sum, less the costs and expenses of administering said trust estate, to be paid to Clara Edgar at the rate of $50.00 per month until all said sum and its earnings have been paid to her. Should she die prior to receiving said full sum and its earnings, the balance unpaid at the time of her death shall be paid to the Mary Bridge Hospital."

With this latter bequest I shall concern myself later; what I now say applies only to the bequests to the "named persons."

Dr. Bridge's will being concededly clear and unambiguous and the respondents having no legal or moral claim on the bounty of the testator, there seems to me no occasion to invoke the rule relied upon by the majority, which enables the courts to rewrite wills on the theory that the court's hindsight is better than the testator's foresight. The rule relied upon developed out of hardship cases, where to deprive a legatee of his or her bequest would be a manifest injustice clearly not intended by the testator and shocking to the conscience of the court.

As the majority says,

"Each case must be examined in the light of its own particular facts in order to determine whether the concept of impossibility of performance should be given controlling effect."

In the present case, the testator ceased to operate his business May 31, 1946. That event terminated the employment of most of those who are here seeking to establish their right to the amounts bequeathed to them in his will. From the time he ceased to operate the business until he died two and one-half years later (January 6, 1949), Dr. Bridge knew that most of those named persons were no longer employees of either himself or the Mary Bridge Hospital, and knew, too, that by the terms of his will "former employees" were "willed and bequeathed nothing." The application, under these circumstances, of the concept of impossibility of performance due to factors which the testator did not anticipate and for which he consequently failed to provide is, in my opinion, a distortion of the rule relied upon.

It is therefore my position that Edna Van Vlack, John Pieroth (now deceased), Harold N. Rosengreen, W. C. Riddell, Laura Zanusse, D. B. Cook, and Ann Conner (O'Connor) were "former employees" at the time of the death of Dr. Bridge and were therefore "willed and bequeathed nothing."

The other bequest challenged by the executor was, as indicated above, to "The National Bank of Washington, in trust for the use and benefit of Clara Edgar."

At the time the will was executed, Clara Edgar was a floor nurse at the Mary Bridge Hospital. She had been employed by Dr. Bridge for more than twenty years. Of her service one witness testified:

"Mrs. Edgar was one of our most trustworthy employees; I depended upon her whenever we got short of nurses. Even if she was on duty she would come back and work that night. I called her on emergencies, delivered babies before the doctors arrived, she was that important to us."

A heart condition forced her to cease working on April 2, 1946. Either because Dr. Bridge knew something of her heart condition or for some other reason, he made a provision for her such as he made for no other legatee named in his will, and created a trust for her benefit. As heretofore indicated, nineteen persons were named as legatees in the section of the will here under consideration. Clara Edgar is not such a "named person"; the bequest is to the National Bank of Washington. Attention is again directed to the fact that nonemployees were named as legatees in this particular paragraph of the will, and the National Bank of Washington certainly belongs in that category.

The executor should be required to pay five thousand dollars, less the appropriate taxes, to the National Bank of Washington, in trust for the use and benefit of Clara Edgar; and the challenge of the executor to the other seven legacies questioned in this proceeding should be sustained.

GRADY, C. J., concurs with HILL, J.